STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
(for filings only)
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310) 452-3200

Attorneys for Plaintiff & Putative
Class Members

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| KORRELL COLE,<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT LUNA, KATHRYN BARGER, HOLLY MITCHELL, JANICE HAHN, HILDA SOLIS, LINDSEY HORVATH, DEPUTY SHERIFF PALENCIA, DEPUTY SHERIFF PINEDA, DEPUTY SHERIFF PALACIOS, DEPUTY SHERIFF MARTINEZ, SERGEANT STELTER,** and **10 UNKNOWN, NAMED DEFENDANTS,**<br><br>Defendants. | 2:23-cv-10392-SB(PDx)<br><br>**FIRST AMENDED COMPLAINT**<br>(pursuant to 08/28/24 order)<br><br>**CLASS ACTION ALLEGATIONS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge Stanley Blumenfeld, Jr. |

Plaintiff makes the following allegations in support of the this first amended complaint:

//

//

//

**JURISDICTION AND VENUE**

1. Plaintiff, **KORRELL COLE**, is a Black person who asserts his federal claims, pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) and subject matter jurisdiction lies pursuant to 28 U.S.C. § 1331 of these federal claims.

2. The matters that are the bases for this action occurred in Los Angeles County, California, and in the City of Los Angeles, and therefore venue lies in the United States District Court for the Central District of California, and in its Western Division, pursuant to 28 U.S.C. § 1391.

**THE PARTIES**

3. Plaintiff is a person who has been subject to Los Angeles Sheriff Department ("LASD") police brutality and thuggery, and defendants are Los Angeles County Sheriff **ROBERT LUNA,** in both his individual and official capacities, Supervisors **KATHRYN BARGER, HOLLY MITCHELL, JANICE HAHN, HILDA SOLIS,** and **LINDSEY HORVATH,** in their official capacities only, **DEPUTY SHERIFF PALENCIA, DEPUTY SHERIFF PINEDA, DEPUTY SHERIFF PALACIOS, DEPUTY SHERIFF MARTINEZ, SERGEANT STELTER,** in their individual capacities only, and **10 UNKNOWN, NAMED DEFENDANTS**.

4. Defendants, each and all are sued in *both* their individual and official capacities, but only in their official capacities for the claims made under *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 657 (1978), with respect to which defendants are sued only in their official capacities.

5. Plaintiff is a person who was both a pre-trial detainee and a convicted person who was been brutalized and subjected to thuggery and subjected to constitutional violations at the hands of defendants.

6.  Defendants and each of them played some material role in the acts and/or omissions alleged hereinbelow and in the setting of policies and customs of the LASD, and their unconstitutional policies, practices, procedures, and customs were the moving forces behind the constitutional violations inflicted on plaintiff.

## ALLEGATIONS COMMON TO EACH COUNT

7.  Each and every allegation set forth in each and every averment herein is incorporated by this reference in each and every other averment and allegation of this pleading.

8.  All acts and/or omissions perpetrated and/or engaged in by each defendant, in their individual capacities, were louche, and done maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, with evil motive, and/or intent, in disregard of the clearly-established rights of plaintiff, and in clear violation of the federal Constitution and of the California Constitution, and of controlling federal law, both statutory and common law, as set forth by both the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit.

9. Defendant Deputy Palencia worked at Works Module 3700 of the Mens' Central Jail.

10. Defendant Watch Commander Unknown Named Defendant/John Doe #1 worked the Jail as a jailer lieutenant, over Module 3700 "EM" Shift Jail Division, and was responsible for the tracking, supervision, and conduct of deputies in jail.

11. Defendant Deputy Pineda worked at Works Module 3700 of the Jail, as a Training Officer Deputy Jailer.

12. Defendant Deputy Palacios worked at Works Module 3700 at the Jail, as a Training Officer Deputy Jailer.

13. Sergeant Stelter #53134 worked at Works Module 3700 at the Jail as a Sergeant, employee of Defendant County.

14. These deputy defendants unlawfully used excessive force against plaintiff and assaulted, battered, harassed, and retaliated against him for utilizing the complaint/grievance process, and this action also is against the Los Angeles County Sheriff, defendant Robert Luna, as the supervisory officer responsible for the conduct of defendants, and for his failure to take corrective action with respect to Sheriff personnel whose vicious propensities were notorious, to assure proper training and supervision of the personnel, and to implement meaningful procedures to discourage lawless official conduct. This action is brought pursuant to 42 U.S.C. §§ 1983, 1985 & 1986, and the First, Eighth, and Fourteenth Amendments to the Constitution of the United States.

15. At the time of the wrongful conduct alleged herein, the plaintiff was both a pretrial detainee and a convicted person who was in the custody of the Los Angeles County Sheriff's Department and was confined in the Los Angeles County Men's Jail ("the Jail"), which is an antiquated, medieval-like, 65-year-old,[1] hell-

---

[1] *See* Wikipedia article on Men's Central Jail, attached hereto as Exhibit 1, and whose contents hereby are incorporated herein by this reference.

hole, operated by both defendants Luna and supervisors Barger, Hahn, Solis, Mitchell, and Horvath, all of whom both refuse to remedy all of its constitutional deficiencies and refuse to shutter it. *See* "Men's Central Jail faces 'severe structural damage' in earthquake, report says," Los Angeles Times, Aug. 27, 2024, and other Times articles attached hereto as Exhibit 2, and all of whose contents are incorporated herein by this reference.

16. At approximately 10:10 p.m. on September 14, 2023, at the Los Angeles County Men's Jail, plaintiff was escorted by Defendant Palencia from the library in Module 1750 to Module 3700-Denver Row.

17. After arriving at 3700-Denver Row, plaintiff changed the channel on the television, and then asked Defendant Palencia if he could get his previously-authorized daily shower and grievances.

18. Defendant Palencia suddenly became aggressive and approached plaintiff in a physically threatening manner and mumbled something to the effect of "keep filing grievances and I'll call and see what happens to you."

19. Then defendant Palencia ordered plaintiff to turn around, to be handcuffed. Plaintiff complied, without any resistance.

20. Defendant Palencia placed handcuffs on plaintiff's wrists, then maliciously adjusted the handcuffs around his wrists excessively tightly, causing plaintiff to suffer from extreme pain, discomfort, and to cut off circulation.

21. Plaintiff complained that the handcuffs were too tight.

22. Defendant Palencia ignored him.

23. Defendant Palencia took hold of plaintiff's arm from behind and escorted plaintiff down a passageway and to the top of a steep, wet, unlit stairwell.

24. Unprovoked and without warning, Defendant Palencia maliciously wrenched plaintiff's restrained arm and forcibly heaved plaintiff forward, and intentionally caused plaintiff to lose his footing and toplunge headfirst down the stair case.

25. Defendant Palencia did not make any effort towards helping prevent plaintiff from falling down the stairwell.

26. By doing this, Palencia violated departmental policies and procedures.

27. Defendant Palencia and his partner Martinez, just stood at the top of the stairwell for moments and laughed, after Palencia deliberately pushed the restrained plaintiff down a flight of stairs, nearly killing plaintiff, via a broken neck or deadly blow to the head. Then defendant Palencia struck plaintiff in the chest.

28. Defendant Palencia and his partner Martinez stole plaintiff's plastic bag of legal paperwork and never returned it.

29. After the deadly incident, plaintiff was placed on a gurney by the Los Angeles Fire Department and rushed to the hospital in an ambulance.

30. Defendant Palencia's use of excessive and deadly force on the unresisting plaintiff left plaintiff hospitalized, wearing a neck brace, and temporarily paralyzed from the waist down.

31. Defendants Training Officers Pineda and Palacios of Module 3700 are directly responsible for failing properly to train trainee Palencia.

32. On 9/16/2023, at the 3700-Denver row, grievance receptacle, at approximately 9:28 am, plaintiff filed grievances against defendant Palencia for retaliation, excessive force, and racially-motivated mistreatment, and this was done in full view of surveillance video cameras. Plaintiff never received a response to his grievances. (Exhibit A, to original complaint, Doc. 1).

33. On 10/1/2023, plaintiff filed an appeal for the Sheriff's failure to properly process and investigate his grievances against staff member Palencia, *et al.*, within the 15-day time limit mandated on the grievance form. The appeal also was ignored by jail supervisors. Plaintiff's grievances are regularly mishandled by jail supervisors.

34. Over a time span of about eight months, plaintiff filed multiple personnel complaints/grievances against Defendant Palencia, for staff misconduct and dereliction of duty, which defendant Palencia was embroiled in pending complaints against him by Plaintiff and other detainees. (*See* Exhibit A)

35. On 9/10/2023, 3000-Floor defendant Sergeant Stelter approached plaintiff's cell with multiple written complaints in his hand against defendant Palencia, for misconduct.

36. Defendant Sgt. Stelter only briefly questioned plaintiff and other detainees about the grievances, but Stelter never actually processed the complaints, provided any reference numbers so that the complaints could be tracked in any database.    37. This included the grievance in which plaintiff expressed he feared for his safety as to Palencia.

38. None of the grievances plaintiff filed against defendant Palencia ever were properly processed and investigated. Yet, defendant Palencia seemed to be well-aware that plaintiff was complaining about his behavior.

39. On September 7, 2023, defendant Palencia approached plaintiff in a physically threatening and menacing manner, and threatened to deploy excessive force against plaintiff, exclaiming: "I'll cuff you up, then fuck you up."

40. When Plaintiff responded "What's wrong with you, dude?", defendant Palencia replied "Nobody gives a fuck about your grievances. On google, it said you're never going home anyway. You shot at a white officer idiot. See! Black Lives **Don't** Matter!", as he walked away down the tier, apparently already aware of the grievances filed against him.

41. Plaintiff was convicted and sentenced in 2022, and at the time of the incidents alleged herein he was detained in Los Angeles County jail, on unrelated non-violent charges, as both a convicted person and as a pre-trial detainee.

42. The incident in aver. 40, made plaintiff afraid to continue filing grievances and had a chilling effect on the exercise of plaintiff's rights to petition the government for a redress of grievances, which is protected conduct. But filing grievances was plaintiff's only way to document the fact that defendant Palencia continued to engage in various retaliatory actions against plaintiff, as a result of him filing grievances. This was a tragic irony.

43. The Jail grievance process is unavailable and futile.

44. The Jail staff ignore grievances and threaten to retaliate for filing them.

45. This is the custom.

46. Plaintiff filed grievances but defendants refused to respond to his grievances or properly to process and investigate his grievances. There exist copies of complaints filed and grievances were filed on video camera.

47. After plaintiff requested responses to his grievances, he on-goingly was subjected to repeated threats of retaliation and violence against plaintiff and his relatives for filing grievances.

48. On September 9, 2023, Defendant Palencia maliciously deactivated plaintiff's telephone account, so that he couldn't communicate with the outside

9

world and his legal team, then ignored multiple detainees needing medical

attention for hours and unleashed a profanity-laced tirade over the module

loudspeaker, screaming: "3k Boys! We are the hardest gang here!" Meaning "3000

Boys," a Sheriff's Deputy Gang originating on the 3000 floor, where this occurred.

A grievance was filed. (*See* Exhibit A).

49. Defendant Palencia is a self-proclaimed deputy gang member, who is

part of a sheriff's deputy gang called "the 3000 Boys."

50. Defendant Stelter reviewed all of these grievances on 9/10/2023, and

failed to do anything whatsoever to protect plaintiff's safety.

51. Instead, there was yet more retaliation ensued.

52. Stelter could've prevented all of this, but he refused to take away any

action to prevent harm.

53. By having personal knowledge of defendant Palencia's illegal actions,

failing to correct that misconduct, and encouraging the continuation of the

misconduct, defendant Stelter also violated plaintiff's rights under Fourth and

Eighth Amendments to the Constitution and caused plaintiff pain, suffering,

physical injury, and emotional distress.

54. Plaintiff was on-goingly subjected to a retaliatory campaign of

harassment by numerous 2000/3000/1750 Floor deputies (gang members and gang

associates) who repeatedly used threats, intimidation, lies, and coercion to try to

dissuade plaintiff from prosecuting personnel complaints/grievances and civil actions, even going so far as to try to get plaintiff to distort the truth and change his version of the events.

55. The key participants of the campaign of retaliation include, but not limited to, the following deputies,: Module 3700 deputies Paz, Training officer Pineda, Palencia, Training Officer Palacios, Training Officer Blake, Sergeant Fernandez, Clara Shortridge Foltz, Court House Sergeant M. Fernandez, Legal Unit Sergeant Michael Larsou, Custody Assistant Donald Hinton, Sergeant Stelter, Sergeant Duck-Worton,, Sergeant Floes, Sergeant Rickell, Lt. Guardman, Custody assistant Gutierrez, Sergeant Bueno Cortez, Sergeant Miranda, Sergeant Cliver, 3700 Training Officer Masuda, Training Officer Hernandez, Duniser, Barrientos, Ibarra, C/A Pineda, Deputy Hernandez working on 9/14/23 at 11:00 pm, Huddleston Ramirez, Rondox, Mendez, Legal Unit Kennedy, Captain Walker, Lt. Montoya, Olivares 3300 Hernandez Sergeant Estrada, Aldama Johnson, Lefevre Salenpour, other Paz, Valle, Horn, all 3000 Floor Sergeants, Ramirez, *etc*. Franco, Lineali, Barragan, Wright, Podroza, Zepeda, Zamorea, Harrisdon, Rouderos, Cisneros, Hennessey, Capacata, Sgt. Gutierrez, Garcia, 1750 Hernandez.

56. The actions described above were committed by the defendants in full view of surveillance cameras.

11

57. After the aforementioned retaliatory use of force against plaintiff, defendant Palencia, on 9/15/23, maliciously and without true facts, went before a sergeant of Los Angeles County Sheriff's Department, and charged plaintiff with a false disciplinary action and wrote a false report claiming the incident was plaintiff's fault, and not the defendant Palencia's fault.

58. The aforesaid disciplinary action was terminated in favor of plaintiff, but with no discipline given by the Sergeant.

59. As a result of the misconduct hereinbefore described, plaintiff experiences humiliation, emotional distress, pain, and suffering, and was otherwise damaged. He was also severely physically injured as a result of conduct alleged.

60. The abuse to which plaintiff was subjected was inflicted as the result of and was caused by the institutionalized practice of the Los Angeles County Sheriff's Department, which was known to, and ratified by Defendants: Los Angeles County Sheriff's Department, defendant Luna, and the County, with the defendants having at no time taken any effective action to prevent LASD personnel from continuing to engage in such abhorrent misconduct.

61. Defendant Luna had prior notice of the vicious propensities of his deputies and defendant deputies, but took no steps to train them, correct their abuse of authority, or to discourage their unlawful use of authority. The failure to properly train defendants included the failure to instruct them in applicable

12

provisions of the U.S. Constitution and the California State Penal Code and with

proper and prudent use of force.

62. Defendant Luna, who has been Los Angeles County Sheriff since Dec. 5,

2022, and who before that was City of Long Beach Police Chief from 2014-2021,

who thus was a very-experienced chief law enforcement officer, to-date of over 10

years' experience, and the supervisor defendants, all ratified, condoned, approved

of, acquiesced in, authorized, tolerated, and were the moving forces behind the

institutionalized practices, and all of the misconduct hereinbefore detailed, by:

a.  Failure to properly discipline, restrict, and control employees, including

defendants Palencia, Pineda, Palacios, and Martinez, and the other

deputies whose names are set forth in aver. 55;

b.  Failing to take adequate precautions in the hiring, promoting, and

retention of police personnel, including deputies listed in a;

c.  Failing to forward to the office of the District Attorney of Los Angeles

County evidence of criminal acts committed by Sheriff personnel;

d.  Failing to establish and/or assure the functioning of a bona fide and

meaningful departmental system for dealing with complaints/grievances

of police misconduct, but instead failing to respond to such complaints,

or responding to such complaints with mis-used bureaucratic power and

official denials calculated to mislead the public. This conduct constitutes gross negligence under state law;

e.  Failing to remedy the unconstitutional conditions of confinement at the Jail; and,

f.  Failing to demolish the Jail.

63. As a consequence of the abuse of authority detailed above, plaintiff sustained damages hereinbefore alleged.

64. Los Angeles County Deputies repeatedly interfered with plaintiff's civil rights by threats, intimidation, and coercion against plaintiff and his family members, after he filed grievances and court documents against them. Plaintiff is in genuine fear for his life of deputy sheriff gang members and their associates, who engage in deputy gang violence against arrestees.

65. The plaintiff in this action, during his imprisonment in the Jail suffered from and was injured by unconstitutional and intolerably bad conditions at the Los Angeles County Men's Central Jail, and they included, *inter alia*, the following:

a. Bad plumbing, with broken toilets in his numerous cells, over-flowing with urine and feces, all over the floors in his cells, which sometimes went on and destroyed his property and belongings, and which he had to clean-up himself; and,

b. Roaches were all over his cells that he lived in, which he had to kill, and being woken up in the middle of the night, with roaches in his bed, crawling on him.

66. The Los Angeles County Sheriff Department has and fosters customs of denial of the right to petition government, by refusing to process inmate grievances, in violation of the First Amendment, and of the use of excessive force by its deputies, in violation of the Fourth Amendment, and of unconstitutional conditions of confinement, in violation of both the Eighth Amendment cruel and unusual punishment clause (for convicted detainees) and the Fourteenth Amendment due process clause (for pre-trial detainees).

67. The custom of use of excessive force includes, for example, uses of excessive force against the following persons: Enzo Escalante (March 10, 2021, in custody), Christopher Francis (Sept. 22, 2023 and April 18, 2024, in custody), Korrell Cole (Sept. 24, 2023, in custody), Jesus Medina (May 24, 2020, not in custody).

68. The custom of unconstitutional conditions of confinement includes infliction on the following prisoners: James Boyd (2019-present), Korrell Cole (2022-2023), Christopher Francis (2023-present), Jesus Medina (2023-2024), and Enzo Escalante (2021-2023).

## COUNT ONE
(Against All Defendants, 42 U.S.C. § 1983)

69. Plaintiff realleges specifically the allegations set forth in above averments, and, by virtue thereof, all defendants are liable to plaintiff, pursuant to 42 U.S.C. § 1983, for violation of plaintiff's First, Fourth, Eighth, and Fourteenth Amendment rights, to be able to petition government, not to be subjected to unreasonable searches, seizures, stops, arrests, and excessive force, not to be subjected to cruel and unusual punishments and to unconstitutional conditions of confinement.

70. Defendant Luna is responsible for the constitutional violations set forth in averment 69 and for the violations committed by the deputy sheriff defendants, because he sets the policies and accepted the customs of the LASD, among which

were unconstitutional, brutalization of jail prisoners, and plaintiff herein was
subjected to such brutalization and thuggery.

## COUNT TWO
(Against All Defendants, for Conspiracy Under § 1983)

71. Plaintiff realleges specifically hereat the allegations set forth
hereinabove, and, by virtue thereof, all defendants also are liable to plaintiff for
conspiracy to violate plaintiff's First, Fourth Amendment, Eighth, and Fourteenth
Amendment rights, pursuant to § 1983, because they had an agreement and/or
understanding that the wrongs perpetrated would be perpetrated, and then they
were perpetrated, by the LASD defendants, beating the crap out of plaintiff, by
throwing him down a flight of stairs, while he was handcuffed behind his back.

72. Defendant Luna for many years has been aware of and permits and
condones deputy misconduct, so that LASD officers free to violate the
Constitution's First, Fourth, Eighth, and Fourteenth Amendments, and here did so,
and he failed to investigate, and covered-up, what occurred in this matter,
notwithstanding that he had access to a videotape of the incident, and thereby
approved of it, condoned it, acquiesced in it, and ratified it, with a meeting of their
minds that this kind of unconstitutional conduct would occur.

## COUNT THREE
(Against Defendant Luna, Under Sec. 1983, *Monell*)

73. "[When] the complaint plausibly alleges a policy, custom, or practice
leading to that violation[, *s*]*ee Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937,
173 L.Ed.2d 868 (2009)[,] [and] Plaintiffs' allegations amount to . . . more than an
'isolated or sporadic incident[ ]' that . . . forms the basis f *Monell* liability for an
improper custom. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) [prosecuted
by plaintiff's counsel herein]." *Saved Magazine v. Spokane Police Dep't*, 19 F.4th
1193, 1201 (9th Cir. 2001).

16

74. Herein, Defendant Luna is liable to plaintiff because he had and has, and fosters, policies, practices, procedures, and customs of First, Fourth, Eighth, and Fourteenth Amendment violations by members of LASD, which policies, *etc.*, in violation of the these Amendments, were the moving forces that caused the violation of the plaintiff's rights, as alleged herein, and, also he is a supervisor defendant who is  liable because there is a custom of improperly indemnifying, and of conspiring to indemnify, LASD officers for punitive damages assessed against those deputies by juries in civil rights cases, or settling those cases to avoid having to decide on whether or not to make such indemnifications, because that practice was a moving force that caused the violations of the plaintiff's rights as alleged herein.

**COUNT FOUR**
(Against All Defendants Under § 1985(3))

75. Each deputy sheriff defendant agreed and/or understood and conspired with at least one other deputy defendant to deprive a plaintiff of the equal protection of the laws, in violation of 42 U.S.C. l985(3), based on a racially-motivated bias against the plaintiff; and the official capacity defendant could have, but did not, prevent the violations of Section 1985(3).

76. Therefore, any deputy sheriff defendant is liable to plaintiff under Section 1985(3), and defendant Luna, who had the power and/or opportunity and/or duty to prevent, but who failed to prevent any violation of Section 1985(3), is liable to plaintiff under 42 U.S.C.1986.

77. Luna, as an official capacity defendant, is liable to plaintiff for all wrongs alleged in this pleading pursuant to *Monell, supra.* This alleged conspiracy is separate from the simple, non-racially-based conspiracy alleged hereinabove.

**CLASS ACTION ALLEGATIONS**

78. Plaintiff is a member of four classes, whose defining characteristics are that they are persons who were subjected to First, Fourth, Eighth, and Fourteenth

17

Amendment violations, at the hands of defendants, at the Los Angeles County Mens' Central Jail, by virtue of: (1) being deprived of the right to petition government, by filing jail administrative grievances; (2) being subjected to unreasonable force at the hands of deputy sheriffs, while in custody and/or in the Jail; (3) being subjected to unreasonable force at the hands of deputy sheriffs; and (4) being subjected to physical conditions at the Jail that are deplorable and "horrific" and that have been for many years and are unconstitutional.

79. Classes (1), (2), and (3) each contain at least 1,000 people, and class (4) contains at least 100,000 people, so that the classes each are so numerous so that joinder of all members is impracticable.

80. There are only common questions of fact and of law with respect to all class members of each class.

81. The claims made by the representative party of each class, plaintiff, are typical of the claims of each class member.

82. The representative of the class, plaintiff, more than fairly, vigorously, and zealously will represent and adequately protect the interests of all class members, both themselves and through their very zealous attorney.

83. Prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the classes.

84. Defendants have acted and will continue to act on grounds generally applicable to every class member in both classes, and the class questions not only predominate but are the only questions that exist, and this action is the far superior manner to other available methods for fairly and efficiently adjudicating the controversies.

18

85. The class members' interests in individually controlling the prosecution or defense in separate actions do not exist, and there are no anticipated difficulties in managing this class action, especially as to identification of the amount of damages, identification of class members, and providing actual notice to virtually all class members.

86. Therefore, this action is maintainable under Fed. R. Civ. P. Rule 23(a), & 23(b)(1)(A),(B)(1), (2), and (3).

87. Although there would appear to be no notice requirement as to (B)(1) & (2) classes, the nature of the notice to be provided to class members would be decided by the court.

88. The definitions of the four classes are as follows: (1) all Los Angeles County Mens' Central Jail prisoners during the class period, Dec. 2019 to the date this action goes to trial, who were subjected to excessive force by deputy sheriffs; (2) all persons during the class period Dec. 2021 to the date this action goes to trial, who were subjected to excessive force by deputy sheriffs; (3) all Los Angeles County Mens' Central Jail Prisoners during the class period, Dec. 2019 to the date this action goes to trial, who were subjected to unconstitutional conditions of confinement; and (4) all Los Angeles County Mens' Central Jail Prisoners during the class period, Dec. 2019 to the date this action goes to trial, who were subjected to unconstitutional deprivation of their right to petition government by reason of their not being avail themselves of a working and honest jail grievance process.
//

**WHEREFORE**, plaintiff requests relief on behalf of himself and on behalf of each class member against each defendant as follows:

1. Compensatory damages $1,000,000;

2.  Punitive damages on all non-*Monell* claims, in sums to be determined by a jury, and as a percentage of the net worth of each defendant, in sums sufficient to deter future misconduct, and not less than $10,000,000 per defendant;

4. The costs of action and interest;

5.  Attorneys' fees; and,

6.  Such other relief as is just and proper.

### JURY DEMAND

Plaintiff demands trial by jury of all issues.

### YAGMAN + REICHMANN, LLP

By:  /s/  Stephen Yagman
**STEPHEN YAGMAN**

20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBT 1

Case 2:23-cv-10392-SB-PD    Document 48    Filed 09/10/24    Page 22 of 61    Page ID
Case 2:24-cv-05716-SPG-AJR    Document 23 #311  Filed 08/27/24    Page 19 of 51    Page ID
#:113



**WIKIPEDIA**
The Free Encyclopedia

# Men's Central Jail

**Men's Central Jail** is a Los Angeles County Sheriff's Department county jail for men in Los Angeles, Los Angeles County, California, United States. Built in 1963, it is one of the oldest county jails in California. The Men's Central Jail is located at 441 Bauchet St., Los Angeles 90012. The Men's Central Jail houses men who are awaiting trial or who have been convicted of crimes.

The Men's Central Jail is considered one of the largest jails in the world.[2][3][4][5][1][6] In May 2013, along with the adjacent Twin Towers Correctional Facility, Men's Central Jail was ranked as one of the ten worst prisons in the United States, based on reporting in *Mother Jones* magazine.[7]

On July 7, 2020, the Los Angeles County Board of Supervisors voted 4–0 to pursue a plan to close the Men's Central Jail within 12 months.[8] In voting to eventually close the 57-year-old facility, county supervisors said they wanted to focus on community-based programs to treat mental health challenges of those entering and exiting the jail system administered by the Los Angeles County Sheriff's Department. The vote came amid deliberate inmate reductions during outbreaks of COVID-19 and the Black Lives Matter movement protests over police violence and the murder of George Floyd.[9]

## Construction and population

The construction of the Men's Central Jail was finished in 1963. The original building was designed to house 3,323 inmates.[10] In 1976, an addition was added to the structure at the cost of $35 million,[11] and by December 1990, inmate capacity was 5,276.[12]

Men's Central Jail has severe overcrowding, leading to problems such as inmates lacking shower facilities, very short recreation times out of their cells, wearing dirty clothes for up to a week, and inmates sleeping on floors for extended periods of time.[13][14][15] In March 1997, the inmate

### Men's Central Jail (MCJ)



| | |
|---|---|
| **Location** | Los Angeles, California |
| **Coordinates** | 34.0590°N 118.2321°W |
| **Status** | Operational |
| **Security class** | Minimum–Maximum |
| **Capacity** | 5,276 |
| **Population** | 4,300[1] |
| **Opened** | 1963 |
| **Managed by** | Los Angeles County Sheriff's Department |
| **Website** | website (https://locator.lacounty.gov/lac/Location/3039766/los-angeles-county-sheriff---mens-central-jail) |

Case 2:23-cv-10392-SB-PD    Document 48    Filed 09/10/24    Page 23 of 61    Page ID
#:312
Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 20 of 51    Page ID
#:114

population was about 13,000,[16] and saw similarly high numbers by June 2015, where the inmate population was about 17,000[1] and increased to 19,000 by August, where the legal limits on the jail population were only for 15,000 inmates.[14]

## Notable inmates

- Chris Brown, recording artist[17]
- Suge Knight[18]
- Todd Bridges, actor, *Diff'rent Strokes*[19]
- Drakeo the Ruler, rapper[20]
- Sean Penn, actor[21]
- Richard Goldberg, sex offender[22]
- Kelsey Grammer, actor[21][23]
- Richard Pryor, comedian[21]
- Tommy Lee, Mötley Crüe's drummer[21]
- Scott Weiland[21]
- Erik Menéndez[23]
- Richard Ramirez[21]
- O. J. Simpson[24][21]
- Shorty Rossi, reality TV personality[25]
- YG (rapper)[26]
- Ron Jeremy, pornographic actor[27]
- Harvey Weinstein, former film producer[28]
- Edward Furlong, actor[29]
- Danny Masterson, former actor[30]

# Services

Men's Central Jail provides some services to its inmates. Inmates can attend self-help classes on domestic violence, alcohol abuse, and substance abuse. Religious services are provided to inmates in the wake of several ACLU lawsuits.[31][32] As of 2004, selected inmates can earn a GED while incarcerated.[33]

# Violence and lawsuits

The ACLU has sued Men's Central Jail for major civil rights violations.[34][35][36][37][38] The United States Department of Justice has also sued the Men's Central Jail.[39][40][41][42]

Case 2:23-cv-10392-SB-PD   Document 48   Filed 09/10/24   Page 24 of 61   Page ID
#313
Case 2:24-cv-05716-SPG-AJR   Document 23   Filed 08/27/24   Page 21 of 51   Page ID
#115

In 2013, federal prosecutors charged 18 Sheriff's Deputies with excessive use of force.[43][44][45][46] In June 2015, Los Angeles Sheriff's Deputies were found guilty of beating a handcuffed man at the Men's Central Jail.[47][48][49][50]

## See also

- Rikers Island (New York City)
- Cook County Jail (Chicago)
- Harris County, Texas jails (Houston)

# References

1. Sewell, Abby (9 June 2015). "County supervisors vote to reconsider size of new Men's Central Jail" (https://www.latimes.com/local/lanow/la-me-ln-county-jail-plan-20150609-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

2. Medina, Jennifer (28 September 2011). "Report Details Wide Abuse in Los Angeles Jail System" (https://www.nytimes.com/2011/09/28/us/aclu-suit-details-wide-abuse-in-los-angeles-jail-system.ht ml). *The New York Times*. Retrieved 4 August 2015.

3. Don Thompson, Associated Press (2 February 2015). "Infographic: County jail populations across California dip after Prop 47 - 89.3 KPCC" (http://www.scpr.org/news/2015/02/02/49608/county-jail-populations-across-california-dip-afte/). *Southern California Public Radio*. Retrieved 4 August 2015.

4. Ucar, Ani (18 November 2014). "In the Gay Wing of L.A. Men's Central Jail, It's Not Shanks and Muggings But Hand-Sewn Gowns and Tears" (https://www.laweekly.com/in-the-gay-wing-of-l-a-me ns-central-jail-its-not-shanks-and-muggings-but-hand-sewn-gowns-and-tears/). *LA Weekly*. Retrieved 4 August 2015.

5. "Cell breakouts, attacks 'easy' in outdated Men's Central Jail" (http://abc7.com/archive/9453411/). *ABC7 Los Angeles*. Retrieved 4 August 2015.

6. "At least one inmate stabbed in riot at Los Angeles jail" (https://www.reuters.com/article/us-usa-jail riot-losangeles-idUSKBN0OJ2UR20150603). *Reuters*. 3 June 2015. Retrieved 4 August 2015.

7. James Ridgeway and Jean Casella (8 May 2013). "America's 10 Worst Prisons: LA County" (http s://www.motherjones.com/politics/2013/05/10-worst-prisons-america-la-county-jail-twin-towers). *Mother Jones*. Retrieved 4 August 2015.

8. "LA County Votes To Initiate Plan To Close Men's Central Jail Within The Year" (https://losangeles. cbslocal.com/2020/07/07/mens-central-jail-downtown-la-county-closed/). *Losangeles.cbslocal.com*. 2020-07-07. Retrieved 2020-07-10.

9. "L.A. County seeks plan to close aging Men's Central Jail in a year" (https://www.latimes.com/calif ornia/story/2020-07-07/mens-central-jail-closure-plan). *Los Angeles Times*. 2020-07-08. Retrieved 2020-07-10.

10. "LA's Men's Central Jail plagued by overcrowding, unsanitary conditions, violence" (https://www.sc pr.org/news/2010/05/05/14795/las-mens-central-jail-plagued-overcrowding-unsanit/). *Southern California Public Radio*. KPCC. 5 May 2010. Retrieved 24 August 2015.

11. Villacorte, Christina (28 August 2017). "Upkeep is proving costly as Men's Central Jail shows its age" (https://www.dailynews.com/2011/12/12/upkeep-is-proving-costly-as-mens-central-jail-shows -its-age/). *Los Angeles Daily News*. Retrieved 24 August 2015.

Case 2:23-cv-10392-SB-PD    Document 48    Filed 09/10/24    Page 25 of 61    Page ID
Case 2:24-cv-05716-SPG-AJR    Document #:314    Filed 08/27/24    Page 22 of 51    Page ID
#:116

12. "L.A. COUNTY'S CENTRAL JAIL : Overcrowding and Age Burden Facility" (https://www.latimes.co
m/archives/la-xpm-1990-12-16-mn-9280-story.html). *Los Angeles Times*. Retrieved 24 August
2015.

13. "ACLU Criticizes Jail Overcrowding" (https://www.latimes.com/archives/la-xpm-1997-03-14-me-38
194-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

14. Villacorte, Christina (28 August 2017). "Men's Central Jail overcrowding crisis could cost $1.7
billion to fix" (https://www.dailynews.com/2014/06/21/mens-central-jail-overcrowding-crisis-could-c
ost-17-billion-to-fix/). *Los Angeles Daily News*. Retrieved 24 August 2015.

15. "ACLU calls Men's Central Jail a dungeon, seeks closure" (https://www.dailynews.com/2009/04/1
5/aclu-calls-mens-central-jail-a-dungeon-seeks-closure/). *Los Angeles Daily News*. 15 April 2009.
Retrieved 24 August 2015.

16. "ACLU Demands Meeting as Jail Crowding Soars" (https://www.latimes.com/archives/la-xpm-1997
-03-01-me-33735-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

17. Breuer, Howard (17 March 2014). "Chris Brown Ordered to Remain in Jail" (https://people.com/cri
me/chris-brown-ordered-to-remain-in-jail/). *People*. Retrieved 5 August 2015.

18. Susman, Gary (26 February 2003). "Suge Knight is released from jail" (https://ew.com/article/200
3/02/26/suge-knight-released-jail/). *Entertainment Weekly*. Retrieved 5 August 2015.

19. Timnick, Lois (10 November 1989). "Mistrial Declared in Bridges' Assault Case" (https://www.latim
es.com/archives/la-xpm-1989-11-10-me-1148-story.html). *Los Angeles Times*. Retrieved 5 August
2015.

20. "Drakeo the Ruler: Thank You for Using GTL" (https://pitchfork.com/reviews/albums/drakeo-the-rul
er-thank-you-for-using-gtl/). *Pitchfork*.

21. LeDuff, Charlie (16 November 2002). "A Celebrity Home That's Not on the Star Maps" (https://ww
w.nytimes.com/2002/11/16/us/a-celebrity-home-that-s-not-on-the-star-maps.html). *New York
Times*. Retrieved 12 April 2020.

22. Dobruck, Jeremiah (2024-05-30). "Notorious sexual predator released from prison, immediately
rearrested by Long Beach police" (https://lbpost.com/news/crime/richard-steve-goldberg-most-wa
nted-arrested-released-long-beach/). *Long Beach Post News*. Retrieved 2024-07-11.

23. Miller, Samantha (22 December 1997). "The Party's Over" (https://people.com/archive/the-partys-
over-vol-48-no-25/). *People*. Retrieved 5 August 2015.

24. LeDuff, Charlie (20 November 2002). "Room 7201: celebrity confinement California style" (https://
www.theguardian.com/world/2002/nov/21/usa). *The Guardian*. Retrieved 5 August 2015.

25. Rossi, Shorty (2012-01-10). *Four Feet Tall and Rising* (https://books.google.com/books?id=MOk5
DQd59w4C&q=shorty+rossi+%22men%27s+central+jail%22&pg=PA64). ISBN 9780307985897.
Retrieved 5 August 2015.

26. YG arrested on robbery charges after Los Angeles home raid (https://www.cnn.com/2020/01/24/e
ntertainment/yg-arrested/index.html) Marianne Garvey and Stella Chan, CNN, January 24, 2020

27. "LASD Inmate Information Center - Booking Details" (https://app5.lasd.org/iic/details.cfm).
*App5.lasd.org*.

28. Vasquez, Whitney (2021-07-20). "Harvey Weinstein Jumps Off Private Jet Without Handcuffs,
Disgraced Mogul Arrives To Los Angeles In Style Following Extradition" (https://radaronline.com/p/
harvey-weinstein-extradition-los-angeles-photos-private-jet-no-handcuffs/). *RadarOnline*.
Retrieved 2024-07-11.

29. "Edward Furlong sentenced to 6 months in jail over probation violation" (https://www.today.com/ne
ws/edward-furlong-sentenced-6-months-jail-over-probation-violation-1C8710418). *Today.com*.

22

30. Schladebeck, Jessica (June 3, 2023). "Danny Masterson awaits sentencing in 'segregation' for safety" (https://web.archive.org/web/20230605011254/https://www.nydailynews.com/snyde/ny-dan ny-masterson-awaits-rape-sentencing-jail-segregation-safety-20230603-imvhm2plprf43mkvndtyus zbky-story.html). *New York Daily News*. Archived from the original (https://www.nydailynews.com/s nyde/ny-danny-masterson-awaits-rape-sentencing-jail-segregation-safety-20230603-imvhm2plprf 43mkvndtyuszbky-story.html) on June 5, 2023. Retrieved June 7, 2023.

31. Himes, Thomas (28 March 2014). "ACLU says Muslim inmates in L.A. jails not treated equally" (htt ps://www.dailynews.com/2014/03/28/aclu-says-muslim-inmates-in-la-jails-not-treated-equally/). *Los Angeles Daily News*. Retrieved 4 August 2015.

32. Chang, Cindy (26 July 2014). "Under new rules, Muslim inmates in L.A. County jails observe Ramadan" (https://www.latimes.com/local/la-me-adv-jail-ramadan-20140727-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

33. Ricci, James (7 April 2004). "Gay Jail Inmates Get Chance to Learn" (https://www.latimes.com/arc hives/la-xpm-2004-apr-07-me-jail7-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

34. "ACLU report: L.A.'s Men's Central Jail 'nightmarish' " (https://www.dailynews.com/2009/04/14/acl u-report-las-mens-central-jail-nightmarish/). *Los Angeles Daily News*. 29 August 2017. Retrieved 4 August 2015.

35. Leonard, Jack; Faturechi, Robert (19 January 2012). "L.A. County Sheriff's Department sued by ACLU" (https://www.latimes.com/local/la-xpm-2012-jan-19-la-me-jails-aclu-20120119-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

36. Stoltze, Frank (5 May 2010). "ACLU: LA County jail guards perpetuate violence" (https://www.scpr. org/news/2010/05/05/14828/aclu-says-la-county-jail-guard-perpetuate-violence/). *Southern California Public Radio*. Retrieved 4 August 2015.

37. Vogel, Chris (19 May 2011). "Men's County Jail Visitor Viciously Beaten by Guards" (https://www.l aweekly.com/mens-county-jail-visitor-viciously-beaten-by-guards/). *LA Weekly*. Retrieved 4 August 2015.

38. "LA County Jails" (https://www.aclu.org/feature/la-county-jails). *American Civil Liberties Union*. Retrieved 4 August 2015.

39. Southern California Public Radio (4 August 2015). "Source: LA Sheriff agrees to new reforms at jails, settles civil DOJ lawsuit" (http://www.scpr.org/news/2015/08/04/53566/la-sheriff-agrees-to-ne w-reforms-at-jails-settles/). *Southern California Public Radio*. Retrieved 4 August 2015.

40. Southern California Public Radio (6 June 2014). "Los Angeles County's jails operating under unconstitutional conditions, says Justice Department" (http://www.scpr.org/news/2014/06/06/4457 3/justice-department-threatens-lawsuit-over-mental-h/). *Southern California Public Radio*. Retrieved 4 August 2015.

41. Faturechi, Robert (25 September 2011). "FBI probing reports of beatings in L.A. County jails" (http s://www.latimes.com/local/la-xpm-2011-sep-25-la-me-fbi-jails-20110925-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

42. Solomon, Diana Beth (28 April 2015). "U.S. reaches anti-bias accord with Los Angeles County sheriff" (https://www.reuters.com/article/us-usa-police-losangeles-idUSKBN0NK03K20150429). *Reuters*. Retrieved 12 April 2020.

43. Robert Faturechi and Jack Leonard (9 December 2013). "18 Los Angeles sheriff's officials indicted, accused of abuse, obstruction" (https://www.latimes.com/local/lanow/la-me-ln-sheriff-indi cted-jail-misconduct-20131209-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

44. Medina, Jennifer (9 December 2013). "U.S. Charges 18 Sheriff's Officers in Inquiry Into Misconduct at Los Angeles Jails" (https://www.nytimes.com/2013/12/10/us/18-charged-in-inquiry-i nto-los-angeles-sheriffs-office.html). *The New York Times*. Retrieved August 5, 2015.

45. Phillips, Erica E. (2 July 2014). "Six L.A. Sheriff's Officers Found Guilty of Obstructing Justice" (htt ps://www.wsj.com/articles/six-l-a-sheriffs-officers-found-guilty-of-obstructing-justice-1404260671). *Wall Street Journal*. Retrieved 4 August 2015.

Case 2:23-cv-10392-SB-PD    Document 48    Filed 09/10/24    Page 27 of 61    Page ID
Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 24 of 51    Page ID
#:316
#:118

46. "18 L.A. County deputies charged in civil rights corruption probe" (http://fox6now.com/2013/12/10/ 18-l-a-county-deputies-charged-in-civil-rights-corruption-probe/). *FOX6Now*. Retrieved 4 August 2015.

47. "L.A. sheriff's deputies, sergeant found guilty in jail beating" (https://www.cbsnews.com/news/los-a ngeles-sheriffs-deputies-sergeant-guilty-jail-beating/). *CBS News*. Associated Press. June 24, 2015. Retrieved 12 April 2020.

48. Rubin, Joel (24 June 2015). "Three L.A. County Deputies Convicted in Beating of Jail Visitor" (http s://www.latimes.com/local/lanow/la-me-ln-three-la-deputies-convicted-in-jail-beating-case-201506 24-story.html). *Los Angeles Times*. Retrieved 12 April 2020.

49. Rubin, Joel (17 June 2015). "Ex-deputy: L.A. County sheriff's deputies beat jail visitor, then lied" (h ttps://www.latimes.com/local/lanow/la-me-ln-sheriff-deputy-testimony-abuse-trial-20150617-story.h tml). *Los Angeles Times*. Retrieved 4 August 2015.

50. "Three Deputy Sheriffs Found Guilty of Federal Civil Rights Offense in Beating of Visitor at Downtown Los Angeles Jail" (https://www.justice.gov/usao-cdca/pr/three-deputy-sheriffs-found-gui lty-federal-civil-rights-offense-beating-visitor). *United States Department of Justice*. 25 June 2015. Retrieved 4 August 2015.

# External links

- Men's Central Jail (https://locator.lacounty.gov/lac/Location/3039766/los-angeles-county-sheriff---mens-central-jail), Los Angeles County Sheriff's Dept.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Men%27s_Central_Jail&oldid=1240418116"

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

CALIFORNIA

# Men's Central Jail faces 'severe structural damage' in earthquake, report says



Major structural deficiencies could turn the Men's Central Jail in downtown Los Angeles into a deathtrap in the event of an earthquake, according to a 2006 report.  (Irfan Khan/Los Angeles Times)

**By Keri Blakinger and Rong-Gong Lin II**

Aug. 27, 2024 12.07 PM PT

The decaying eyesore that is Men's Central Jail has sparked an impressively broad array of health and safety concerns in recent years. There were the fires, the rats, the drugs, the mold and the persistent violence, both from staff and inmates.

29

But a newly resurfaced engineering study reveals another problem: Major structural deficiencies could turn the aging building into a deathtrap in the event of an earthquake.

Completed in 2006, the 72-page county-commissioned study found that the jail suffers from weak walls, inadequate reinforcements and concrete so brittle that it could crack or shatter under pressure.

"These kinds of vulnerabilities would definitely lead to the potential for a fairly catastrophic failure," said engineer Ryan Wilkerson of Los Angeles-based Nabih Youssef Associates Structural Engineers. After reviewing the report, Wilkerson told The Times that a key concern would be a partial collapse of the jail that could "certainly" kill people. Without more advanced study, a total collapse can't be ruled out as a possibility, he said.

Like much of downtown, the jail sits on top of the Puente Hills thrust fault system, which experts say is capable of producing a powerful magnitude 7.5 earthquake and is one of the region's most dangerous fault systems. It is the same system that rattled the region this month, when a magnitude 4.4 quake hit hard enough to shake the inside of the jail.

Fixing the problem, the study said, would require extensive upgrades estimated to cost $464 million a decade ago. Between inflation costs and interest payments, the price tag now probably would be far greater. Yet none of the work has been done — and officials said it's not on the agenda.

Last year, when The Times asked county officials for a list of aging, at-risk buildings earmarked for seismic retrofitting, Men's Central Jail wasn't in the catalog of 33 troubled structures.

In an emailed statement, the Los Angeles County Sheriff's Department said the jail didn't make the list because the county has long planned to shut it down.

"For many years the County has indicated its desire to replace Men's Central Jail or to close and demolish the facility without replacement," the statement said. "Therefore, many of the deferred maintenance needs and expensive building infrastructure replacements have not been funded. Only the routine, day-to-day, maintenance projects were implemented to keep the building functional."

For people who are held or work in the jail — or advocate for those who do — the report sparked concern, if not exactly surprise.

"The conditions at Men's Central Jail are abysmal for our deputies who work there and the inmates alike," said Richard Pippin, president of the Assn. for Los Angeles Deputy Sheriffs. "To learn that the actual structural integrity of the 60-year-old MCJ is in question is sadly not a surprise."

The American Civil Liberties Union, which resurfaced the 18-year-old report this month, pointed to the seismic risks as more evidence that the facility should be closed.

"It's easier to ignore the dangers from earthquakes just because they're so rare," said Corene Kendrick, deputy director of the ACLU's National Prison Project. "But this isn't an abstract concern, this is a real concern, and the county has just ignored it, and it's just more evidence of why Men's Central Jail needs to be shut down."

Built in 1963 to alleviate overcrowding, the county's largest jail has long been beset by structural problems and persistent maintenance issues. Oversight inspectors regularly report finding flooded cells, broken toilets and cell doors that won't open. The heating and cooling systems are so antiquated that in recent years, at least two inmates have died after showing signs of hypothermia.

There are no smoke detectors or sprinkler systems in the inmate housing areas. And the building's antiquated layout and unmonitored cameras   leave blind spots where it's easy for violence to go unnoticed.

For years, county leaders have talked about getting rid of the facility — sometimes by replacing it with another jail, sometimes by replacing it with a mental health treatment facility and sometimes by simply not replacing it at all. After five years of pursuing the last of those options, this month the Board of Supervisors changed course and started once again discussing possible replacements.

"The pendulum has swung," Supervisor Holly Mitchell said at a board meeting earlier this month. "We keep saying: When are you closing Men's Central Jail? I think there needs to be an 'And what are we building or creating for this population that perhaps pretrial, diversion, community settings won't match?'"

The 2006 study grew out of a prior effort to address the county's changing carceral needs, though at the time the plan was to explore adding high-security beds to the facility. The L.A. County Department of Public Works tasked gkkworks with completing a feasibility study — and the result revealed a host of seismic failings.

One of the biggest has to do with the concrete construction.

Nonductile concrete buildings — such as Men's Central Jail — were common in the 1950s and 1960s. Generally speaking, the structures don't have enough steel reinforcing bars to prevent concrete from exploding out of the building's columns when an earthquake hits. This flaw, now well known, was identified after the 1971 Sylmar quake.

During that magnitude 6.6 earthquake, two concrete structures at the Veterans Administration Hospital in San Fernando collapsed and 49 people died. Concrete stairwells and buildings on a hospital campus in Sylmar also collapsed, and three people died.

Afterward, non-ductile concrete structures were deemed so hazardous that their construction was banned.

But Men's Central Jail was built well before that, and Wilkerson said the feasibility study "describes the building with all the classical, nonductile concrete issues that we are concerned about," including a "lack of general strength."

The fact that Men's Central Jail withstood that shaking — as well as the later 1994 Northridge earthquake — does not mean it will escape damage in the future. Both earthquakes were centered in the San Fernando Valley, and by the time shaking arrived downtown, it was considerably weaker.

Aside from the concrete concerns, the 2006 report also lays out a variety of other "undesirable structural attributes" that it says "would result in significant-to-severe structural damage in the event of a major seismic disturbance."

The building's walls and columns are overstressed, which means they may not be able to support the floors above them. The ground floor — which has some windows — is relatively flimsy compared with the upper floors. And there's what is now known as a design flaw involving columns that are too short on the second and third floors, which pose a significant hazard.

In addition to the problems identified in the study, Men's Central Jail, like large swaths of the L.A. Basin, sits in what's known as a liquefaction zone. Liquefaction occurs when shaking from an earthquake effectively turns the land into quicksand. Typically this happens in places where the ground is made of loose sand or silt and filled with groundwater — such as near rivers, like the one a few hundred feet from Men's Central Jail.

Liquefaction can cause structures to tilt, or it can lead to a more dramatic phenomenon known as lateral spreading, in which buildings on suddenly fluid soil slide down gentle slopes, such as toward river banks.

There's no mention of those possibilities in the feasibility study, but Wilkerson said
that's because it came out before liquefaction zone maps were better understood.

"We know now," Wilkerson said, "that the river basin downtown has a high
groundwater table and a really granular type of soil, so there's a zone in this downtown
region where liquefaction is a potential."

When that happens, he explained, buildings can start to settle "in very uneven ways" —
one part might settle 6 inches, while another section might not settle at all. "That's a
type of seismic vulnerability," he added.

Fixing the problems would — predictably — be expensive and logistically challenging.
The study includes a four-page list of proposed seismic upgrades, such as adding 2-foot-
thick reinforced concrete shear walls extending from the foundation to the roof, putting
supportive "jackets" around the existing columns, and adding a variety of reinforced
concrete beams and flanged buttress walls. For the jail's infirmary, there are options
including adding new steel-braced frames.

Achieving any of that probably would require vacating all or part of the facility for
several years, the study said. And, although completing the minimal work needed to
achieve a "life safety" level of seismic performance was estimated to cost around $251
million if it started in 2006, more expansive changes required to prevent death and keep
the building habitable in the event of a major quake would have cost more than $303
million at the time.

In the meantime, the building continues to shake.

One former jail employee — who asked not to be named due to pending litigation — told
The Times she was doing rounds when a quake hit sometime around 2019. She
described feeling a jolt before the facility went on lockdown. And although no one was

hurt, the incident served as a reminder of how old and decrepit the facility was. She said that afterward her "greatest fear" was that the jail's floors would cave in.

A defense lawyer, who asked not to be named because he was not authorized to speak on the record, described being in the jail when the magnitude 4.4 earthquake shook the jail earlier this month.

"There was a loud boom, and then the interview cubicles started to rattle very, very heavily, and, honestly it felt like they might collapse," the attorney said.

If that happens, Kendrick, the ACLU lawyer, warned that the county could face significant and costly liability in court — especially since county leaders were alerted to the problems nearly two decades ago.

"The legal concept with cases involving prisons and jails is deliberate indifference, and whether government officials are aware of a substantial risk of serious harm to incarcerated people," she said.

"Something like this is the paradigmatic example of substantial risk of serious harm," Kendrick continued, "and the failure of the county to act for almost 20 years is the textbook definition of deliberate indifference."

## More to Read

**Editorial: A shiny new jail in L.A. is a bad idea, no matter what it's called**

Aug. 16, 2024



FOR SUBSCRIBERS

**Los Angeles' building earthquake retrofit data have been outdated for years, Times investigation uncovers**

Aug. 16, 2024



## Dangerous L.A. fault system rivaling the San Andreas tied to recent earthquakes

Aug. 8, 2024





**Keri Blakinger**

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their extreme isolation with elaborate fantasy. Her work has appeared everywhere from the BBC to the New York Daily News, from Vice to the Washington Post Magazine, where her 2019 reporting on women in jail helped earn a National Magazine Award. She is the author of "Corrections in Ink," a 2022 memoir about her time in prison.



**Rong-Gong Lin II**

Rong-Gong Lin II is a Metro reporter based in San Francisco who specializes in covering statewide earthquake safety issues and the COVID-19 pandemic. The Bay Area native is a graduate of UC Berkeley and started at the Los Angeles Times in 2004.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

Los Angeles Times

CALIFORNIA

# Oversight inspectors accuse Sheriff's Department of retaliation after reports on jail fires



In the decades since the L.A. County Men's Central Jail opened, inmates have regularly set fires for a variety of reasons. (Irfan Khan / Los Angeles Times)

By Keri Blakinger
Staff Writer

May 2, 2024 3 AM PT

Oversight commissioners have repeatedly accused the Los Angeles County Sheriff's Department of retaliating against inmates at Men's Central Jail after inspectors called

attention to the ongoing problem of fires burning unchecked inside the decrepit downtown lockup.

For years, inmates have been using batteries, razors, toilet paper and other items to set blazes when they want to cook food or heat water. But last summer, oversight inspectors — alarmed by three particularly large fires they'd witnessed — drew attention to the issue in commission reports and public meetings.

Afterward, a Times investigation found the problem stretched back several decades and was possible in part because the inmate housing areas in the aging facility have no sprinklers to douse blazes or blaring smoke detectors to prompt jailers to respond.

Then, in a move Sybil Brand Commission members Eric Miller and Mary Veral told The Times last month was "retaliatory," jail officials confiscated batteries that high-security inmates in isolation used to listen to their radios.

Inmates responded with a hunger strike that department officials said has since ended. The fires, however, have not.



CALIFORNIA

**In Men's Central Jail, fires are common, smoke alarms are not: Smells 'like a campfire'**

Sept. 27, 2023

"It still smelled like fires, but they're not doing anything about them — they're just taking away the batteries," Veral told The Times after a visit to the jail this week. "I'm pretty sure you can light fires other ways."

The Sheriff's Department did not deny the accusations of retaliation but told The Times that the battery-powered radios had only been available as part of a pilot program. The department did not explain how fires were set in the years before the pilot program

made battery-powered radios available to ᴸᴸᴸnates. Officials are now exploring radio
alternatives that do not require batteries, the department said.

"The safety of the inmates in our custody is our highest priority," the department said in
a statement. "Regular searches are conducted in all inmate housing areas in an attempt
to locate any outstanding batteries or other ignition sources."

Though the recent concerns about fires have brought the issue to the fore, blazes have
been a problem in Los Angeles County lockups for more than a century. In 1921, the
former county jail descended into an 18-hour riot after one man started a fire to heat his
coffee and jailers responded by placing him in solitary confinement. That unrest helped
prompt the construction of another jail; it was eventually condemned in part because
the shortage of emergency exits made it a firetrap.

When Men's Central Jail opened in 1963, building codes still did not require automatic
sprinklers or smoke detectors in any of the housing areas. Instead, the facility relied on
a manually triggered alarm system, trusting the jail staff to spot fires and alert people.
Though there have been some upgrades, jail officials previously told The Times that is
largely how the system still works today.

In the decades since Men's Central Jail opened, inmates have regularly set fires for a
variety of reasons. Several former inmates have told The Times that people use fires to
cook their food, though sometimes they also use them to heat their water, stay warm or
smoke cigarettes and drugs.

During an inspection by members of the Sybil Brand Commission in June, Veral said
she spotted three large blazes on the second floor of the downtown facility. When she
alerted jailers to the problem, Veral said, they shrugged and told her the inmates were
cooking their canteen food and there wasn't much the guards could do about it.

Some lockups facing similar fire problems elsewhere have tried to tackle the issue by getting money for smoke detectors and more robust fire alarm systems. In Texas, a 2020 investigation by the Marshall Project, a nonprofit news site, found that the prison system had been violating state fire safety regulations for more than a decade and that men incarcerated there were regularly starting blazes to attract the attention of guards who they said ignored their needs.

After that reporting, the prison system more than tripled its spending on fire alarms. Before those installations were completed, further reporting found that several prisoners died in cell fires. This week, a prison spokeswoman confirmed that the state has again bumped up its fire safety spending to more than $13 million in 2024. She also confirmed to The Times that inmates in Texas are still allowed to have radios.

Yet Los Angeles has handled its fire hazards differently, as oversight inspectors detailed in a report last month.

"In June 2023 SBC commissioners witnessed fires in cells and brought the issue to the attention of [the L.A. County Sheriff's Department] in hopes they would take steps to ensure the safety of people incarcerated and working inside of Men's Central Jail," the report said. "LASD has not done anything to address the issue except to take away batteries from everyone incarcerated in the jail except a few people."

For the men living in isolation on the third floor — which is not the same floor where commissioners reported fires in June — the report said the radios "are one of the few things they can purchase to help with their mental health by providing music and entertainment while they are confined in their cell."

The report went on to question why department officials thought "prohibiting the purchase of batteries was the only possible response to the issue of fires," instead suggesting that officials consider more frequent inspections to determine the source of the fires.

At a public meeting last month, Miller described the move as "retaliation by the Sheriff's Department who, instead of ensuring that [inmates] get hot meals, have taken away batteries."

In responses to questions from The Times, the Sheriff's Department said its decision to take away batteries stemmed from the outcome of arson investigations that determined batteries had been the ignition point for recent fires on the third floor and elsewhere in the jail.

Officials also said the pilot program to allow inmates radio access — something that has been common in jails and prisons across the country for decades — started in 2017 and only expanded to the third floor this year.

The program was determined "not to be successful," in part because the "antiquated and unique physical layout" of Men's Central Jail "created challenges," the department said. "Nonetheless, these factors continue to be evaluated in our efforts to identify opportunities to expand services to our inmate population, in the safest manner possible."

## More to Read

'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan

Aug. 5, 2024



California's inmate firefighter crews are dwindling just as the state starts to burn

July 9, 2024



Inmate hung a noose. Jailers too busy watching 'explicit video' to
intervene, inspectors say

June 5, 2024



 Keri Blakinger

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining
the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering
criminal justice for the Houston Chronicle and then covering prisons for the Marshall
Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her
insightful, humane portrait, reported with great difficulty, of men on Death Row in
Texas who play clandestine games of "Dungeons & Dragons," countering their
extreme isolation with elaborate fantasy. Her work has appeared everywhere from the
BBC to the New York Daily News, from Vice to the Washington Post Magazine, where
her 2019 reporting on women in jail helped earn a National Magazine Award. She is
the author of "Corrections in Ink," a 2022 memoir about her time in prison.

# Inmate hung a noose. Jailers too busy watching 'explicit video' to intervene, inspectors say



Inspectors at Men's Central Jail, shown in 2022, documented mold, mildew and inadequate food and water last month. They also found bugs coming out of the sinks, along with "small black worms." (Irfan Khan / Los Angeles Times)

By Keri Blakinger
Staff Writer

June 5, 2024 3 AM PT

When a pair of oversight inspectors walked up to one of the deputies' stations inside Men's Central Jail last month, they were already exasperated. During their visit to the

43

high-security unit, the inspectors later wrot~~e~~    ~~…en~~ report, they'd been concerned to
see a noose in one of the cells.

They were even more concerned when they realized a jailer had walked by for a safety
check and ignored it.

The first time an inspector approached the deputies to tell them about it, he said, the
eight jailers sitting in front of a television brushed him off. When he returned half an
hour later with another inspector, he realized why: The deputies were busy watching a
"sexually explicit" video, according to an oversight report published this month.

"The degree of callousness they were exhibiting was just horrific," said Eric Miller, one
of the two Sybil Brand Commission inspectors who wrote the report. "What's the
purpose of the security check if you're not actually taking any action?"

It was only after inspectors asked several deputies to intervene that one jailer finally
tore down the noose before the inmate harmed himself, the report said.

To Haley Broder, the inspector who accompanied Miller that day, the failure to act
seemed to be representative of larger problems she saw inside the decades-old facility.

"There was just continuous neglect and bad conditions," Broder told The Times this
week. "People were saying they were hungry. We saw people with giant open wounds.
The trash was just everywhere — there's so much trash. It smells. There are fires. And it
seems in general there is just a genuine lack of interest in changing that situation."

In an emailed statement, the Los Angeles County Sheriff's Department said it has
addressed several of the issues identified in the June report. Officials did not say
whether the deputies caught watching the video have been reassigned but told The
Times there is now an investigation underway.



CALIFORNIA

**6 inmates, 2 jailers hospitalized after 'toxic substance' exposure at women's jail in Lynwood**

June 5, 2024

"The department investigates all allegations of misconduct and expects its personnel to perform its responsibilities in a professional manner in accordance with department policy," the statement said. "When violations of policy and procedures are discovered, personnel are held accountable."

The latest problems in the jail came to light after Miller and Broder visited for a surprise inspection in mid-May. When they entered the first-floor high-security unit, the inspectors stopped to talk to a man who'd been let out of his cell to shower. As they talked, Miller said, they watched a deputy walk down the row to look inside each cell for a safety check. A few minutes later, Broder said, she peeked into the open cell of the man who'd come out to shower.

That's when she spotted the noose.

"Though unlikely to support the incarcerated person's weight, the noose was obvious to anyone looking into the cell," she and Miller wrote in their report.

While Miller went to find a deputy, Broder — a trained social worker — stayed behind to talk to the apparently suicidal man in the shower, who had by then started banging his head against the wall.

At first, Miller said, he went to the deputies' station, where he found eight jailers seated in front of a television.

"The deputies said they would check on the cell later," the inspection report said, "but remained seated watching the video on the television."

45

Eventually, Miller said, he tracked down the first deputy he'd spotted doing rounds, and convinced him to remove the noose.

After the commissioners finished inspecting the rest of the unit, they returned to discover the eight deputies were still sitting at their station watching a "sexually explicit video" on their television. When Miller walked in, he said, they didn't move to turn it off.

"To me it looked like the beginning of an OnlyFans video or something," Miller said. "It was women in underwear, and it certainly didn't look like they were going to put more clothes on. It looked like they were going to take them off."

 CALIFORNIA
**Juvenile hall fight videos raise question: Can L.A. County probation reports be trusted?**
May 30, 2024

Officials did not respond to a question from The Times about what exactly the deputies were watching.

It was only when Broder walked in a few seconds after Miller that the deputies "hurriedly removed the video from the screen," the report said.

The report did not name the deputies involved.

The jails have long struggled to provide constitutionally adequate care and living conditions. The county is currently subject to four court-enforced settlement agreements stemming from federal lawsuits over poor treatment of inmates and bad living conditions.

The newest of those settlements dates back to 2015 when — after a rise in jail suicides — the U.S. Department of Justice took legal action against the county for failing to provide adequate treatment for severely mentally ill inmates. The oldest of the cases is focused on living conditions and dates back to the 1970s, but it still remains open because the Sheriff's Department has never fully complied with the terms of the settlement.

"Men's Central Jail is a rolling settlement agreement violation," Miller said. "And no one is willing to take responsibility."

Melissa Camacho concurred. She's an American Civil Liberties Union of Southern California senior staff attorney representing inmates in two of the ongoing federal lawsuits.

"Issues with safety checks and not notifying anyone that they saw a noose during a safety check have to be clear violations of the consent decree in the DOJ case," she said. "That case is focused on reducing the numbers of deaths by suicide, so to walk by a noose is beyond the pale."

On that same floor of the jail, inspectors spotted several other problems. Some cells had broken toilets or leaking pipes, and the housing areas were humid from the constant drip of leaking showers, the report said. Inmates complained of rats and cockroaches in their cells and food, and inspectors said they saw mildew on ceilings, showers and in cells.

"There was also a man whose cell was covered in mold and water and he was using his clothes to sop up the water," Broder said. "In that unit they don't have books, they don't have pens. They have absolutely nothing, and it's completely dark."

On the fourth floor of the jail, inspectors wrote that some cells had no cold water, so the inmates had rigged up a system to pass water from cell to cell using strings and plastic bottles. There was a "strong smell of fire burning" and "trash everywhere."

In multiple cells on that floor as well as on the first floor, the mattresses had chunks
missing, an issue Camacho found particularly vexing. Over the last 50 years, the jails
have repeatedly landed in legal trouble for failing to provide mattresses to all inmates,
<u>forcing some to sleep on urine-soaked floors or chained to benches</u>.

"Having mattresses with chunks missing violates an order that has been in place since
the 1970s," Camacho said. "It's assumed when the Sheriff's Department is ordered to
give everybody a mattress it will be a complete mattress and not a partial mattress."

On the fifth floor, inspectors said, inmates were triple-bunked in a hot cell block where
the air conditioners were filled with lint. There were bugs coming out of the sinks, the
report said, along with "small black worms."

One person reported that there was "a sick inmate in the bunk above them whose
defecation was falling into their bunk." The inmate told inspectors the deputies had
ignored their requests to help the sick person.

In several housing areas throughout the jail, inspectors said, inmates complained there
wasn't enough food, and the meals they did get were often cold or inedible. In one dorm,
a man showed commissioners a carton of fully curdled milk he said he'd received that
day. When inspectors talked to medical staff about it, one employee concurred that
there "appeared to be insufficient food for the incarcerated people," <u>according to the
report</u>.

In its statement, the Sheriff's Department did not address allegations about a lack of
food but said that it had already resolved the cold water problem and that officials
worked to have such issues "corrected as expeditiously as possible."

The department said that none of the inspectors reported a sick inmate during their
visit, and that jail officials would contact the commission for further details. The

department also said that its own inspection this week did not reveal any black worms, and that the jail maintains a contract with an exterminator.

"The Sheriff's Department often says they don't have enough staff," Camacho said. "What the Sybil Brand Commission tour shows is that it isn't that there isn't enough staff — it's that they don't do their job. And in this case, it's that they were watching porn instead of doing their job."

## More to Read

L.A. County deputy arrested for allegedly smuggling heroin into jail, sources say



Oversight inspectors accuse Sheriff's Department of retaliation after reports on jail fires



Why was 2023 such a deadly year in Los Angeles County jails? It depends on whom you ask



 Keri Blakinger

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their

Los Angeles Times

CALIFORNIA

# 'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan



Built in the early 1960s, the now-decrepit Men's Central Jail has been a vexing issue for the county. (Irfan Khan / Los Angeles Times)

By Keri Blakinger and Rebecca Ellis

Aug. 5, 2024 3 AM PT

In the summer of 2019, justice reformers celebrated because the Los Angeles County Board of Supervisors scrapped a controversial $1.7-billion plan to replace the county's oldest lockup — the dungeon-like Men's Central Jail on Bauchet Street — with a jail-like mental health facility.

Buoyed by a rising tide of prison reforms across the country, county leaders decided to focus instead on decreasing the jail population by creating more alternatives to incarceration. The new goal would be to close Men's Central Jail without building a replacement.

Five years later, there are roughly 5,000 fewer inmates — but Men's Central Jail is still open. And at the state level, the tides are changing, as voters are set to consider increasing the penalties for <u>low-level theft and some drug crimes</u>, both moves that could balloon the jail population.

Amid that backdrop, the board appears to be rethinking its no-new-jails strategy.



**CALIFORNIA**

**Your guide to Proposition 36: Stiffer penalties for some drug and theft crimes**

July 10, 2024

"The pendulum has swung," Supervisor Holly Mitchell said at Tuesday's board meeting. "We keep saying: When are you closing Men's Central Jail? I think there needs to be an 'and what are we building or creating for this population that perhaps pretrial, diversion, community settings won't match.'"

It's a question supervisors have been unwilling to entertain for the last five years, arguing they could shrink the jail population to zero without a new facility. But the board publicly changed its tone after Sheriff Robert Luna and his top jail official told them three-quarters of county inmates are facing charges too serious for diversion programs.

"I felt like we finally broke through the discussion of why it's needed and justification as to why it's needed, because numbers don't lie," said Supervisor Kathryn Barger in an interview. "A replacement has to take place."

What the county might replace the jail with — or where it would site a replacement —
remains unclear.

To some justice reformers, the recent change of tone comes as a profound
disappointment.

Claire Simonich, associate director of the nonprofit Vera California, questioned the
department's claim that 75% of people in the jails couldn't be diverted, as well as the
notion that a new facility would solve the problems currently plaguing the county's
lockups.

"Men's Central Jail is decrepit," she said. "Building another jail won't address many of
the problems and concerns that we see at Men's Central Jail — like overdose deaths,
inhumane treatment and inadequate mental healthcare."

\*\*\*\*

When Men's Central Jail opened five decades ago, county leaders hoped the new
capacity would end overcrowding and, in the process, improve worsening conditions in
local lockups. Instead, the facility has given rise to federal lawsuits, aggressive deputy
gangs, a sweeping scandal that landed a former sheriff in prison and a persistent string
of complaints from inmates, oversight officials and community members.

But county leaders faltered in response. Three years after agreeing the county needed to
build a new jail, the board in 2018 approved a $2.2-billion plan to do that — by tearing
down the existing facility and replacing it with a rehabilitation-focused Consolidated
Correctional Treatment Facility.



CALIFORNIA

**L.A. County to relocate some inmates, build jail to treat the mentally ill**

Aug. 11, 2015

The following year, the board changed course and instead greenlit a $1.7-billion project dubbed the Mental Health Treatment Center. Approved in a 3-2 vote, the planned facility would have been overseen primarily by the Department of Health Services instead of the Sheriff's Department, though a limited number of deputies would have provided security.

"It's still a jail," Supervisor Hilda Solis said at the time, opposing the plan. "It's still walls. It's still preventing people from having freedom, the possibility of even rehabilitation."

A few months later, the board scrapped the idea and started over, eventually embracing a "care first, jails last" philosophy paired with the goal of tearing down the decaying jail and not building a replacement. In 2021, the board approved an ambitious plan to decrease the number of people in custody by several thousand so the county could shut down the facility bit by bit before closing it completely.

But the planned closure date — in early 2023 — came and went, and the jail remains open. Last year, the board floated a motion outlining several recommendations to decrease the population but offering no concrete timeline for closure.



CALIFORNIA

**D.A. will not charge deputy seen on camera appearing to slam inmate's head into wall**

June 8, 2024

Meanwhile, conditions have not improved. The county is still grappling with several longstanding class-action lawsuits alleging abuse, poor conditions and inadequate mental healthcare behind bars. The jail death rate has risen sharply in recent years.

And this year, inspections by the county's Sybil Brand Commission have revealed mold, rats, fires, broken toilets, sink drains filled with "small black worms" and cells covered

in feces. In May, two inspectors found a large group of jailers watching a "sexually explicit" video instead of tending to a seemingly suicidal inmate who'd <u>hung a rudimentary cloth noose in his cell</u>.

\*\*\*\*

The tenor of last week's board meeting signaled yet another change of direction in the county's response.

Though the agenda called for a discussion about the deteriorating conditions at Men's Central Jail, the conversation quickly shifted to plans for the facility's future.

Luna told supervisors he wasn't sure the county could ever decrease its incarcerated population enough to close Men's Central Jail without a replacement, in part because officials estimate so many inmates are facing charges that are too violent or serious for diversion programs. Instead, he suggested building what he called the "Care First Treatment Campus," which he said wouldn't necessarily be run by sheriff's deputies.

Barger, the board's lone Republican, seized on the suggestion as a path forward that could garner support from her more progressive counterparts.

"Men's Central Jail needs to be torn down no matter what," Barger said at the meeting. "The fact that it doesn't have to be a sheriff-run facility ... maybe you just opened up a new door in terms of finally doing something."

Solis, historically one of the loudest opponents of a new jail on the board, was adamant that, if another facility was built, it should not be in her <u>area</u>, which she said was already overwhelmed with carceral facilities, including Men's Central Jail and Twin Towers downtown.

"I don't want to see another jail built, obviously," she said. "But if the board goes that way, it better not be in my district."

Lindsey Horvath, the newest supervisor and one of the most progressive on the board, was skeptical of the concept and told The Times she wasn't "familiar enough" with Luna's vision to support it.

"I don't know of a facility that is run by a sheriff's department that is not considered a jail," she said in an interview.

\*\*\*\*

The shift sparked swift pushback from justice reform advocates, community activists and some jail oversight officials.

"I was totally blindsided by that," said Anthony Arenas, an organizer with Justice LA, which has long opposed building any new jails. "It's just going to be Men's Central Jail under a new name — a 'Care First Treatment Campus' — which is even more disturbing given that this idea of 'care first, jails last' came from the community members who have advocated closing Men's Central Jail with no replacement."

During their Thursday morning meeting, members of the Sybil Brand Commission — a county oversight body that inspects local jails — panned the idea of a "care first" facility, saying "care first" is "not a thing" in the historically troubled culture of Los Angeles jails.

"This is not just a facility issue," commissioner Haley Broder told The Times afterward, highlighting examples of neglect and retaliation by jailers. "This is a culture issue."

And Peter Eliasberg, chief counsel at the American Civil Liberties Union of Southern California, rejected the core claim that started the discussion — the idea that three-quarters of the jail population can't be diverted or released pretrial.

"Nobody should be buying into that as a number that is solidly grounded," he said. The county's Office of Diversion and Reentry has successfully kept thousands of people — including some facing serious charges — out of the jails but has never been adequately funded, he said.

And a recent UCLA study found that Los Angeles courts are setting bail amounts far higher than the state average. Simply decreasing bail amounts, Eliasberg said, could help lower the jail population.

The assertion that most of the jail can't be diverted is "preposterous," he continued, adding: "If the board is thinking about making policy based on that statement, my father had a phrase he would say — 'You're leaning on a weak reed' — and I think that's entirely appropriate here."

## More to Read

**Some L.A. County supervisors say proposed expansion of the board is rushed**

July 9, 2024



**Opinion: California's budget deficit will force difficult cuts. This one should be the easiest**

April 30, 2024



**Editorial: Juvenile probation failures have left L.A.'s troubled kids nowhere to go**

April 8, 2024



 Keri Blakinger

56

Los Angeles Times

OPINION

# Editorial: A shiny new jail in L.A. is a bad idea, no matter what it's called



Men's Central Jail, shown in 2019. Los Angeles County leaders agreed that the jail should be demolished but have not determined how else to care for or supervise thousands of people after their arrests or convictions. (Al Seib / Los Angeles Times)

### By The Times Editorial Board

Aug. 16, 2024 5 AM PT

There is no disagreement over the proper fate of Men's Central Jail in downtown Los Angeles. The decrepit facility must be torn down with all deliberate speed — just as soon

as county leaders make alternative arrangements for the thousands of people housed there at any given time.

And there's the rub. What do we do with everybody, especially the enormous percentage of people who landed in jail in part because of psychiatric or drug problems?

For years, the Board of Supervisors clung to the most rote and self-destructive answer: Build another jail, with a new name to imply a new mindset. It was going to be called the Consolidated Correctional Treatment Facility, then the Mental Health Treatment Center. The name being bandied about now is the Care First Treatment Campus.



OPINION

**Editorial: L.A.'s cruel and deadly jail is still full on shutdown date**

March 30, 2023

Yet all those fancy labels are just euphemisms for "jail." They all describe a single large, secure building, located on the footprint of Men's Central Jail, surrounded by other jails, and staffed by sheriff's deputies.

The board hears regular reports to monitor progress on closing the jail but does little to meet the various deadlines it sets, and then misses. During last month's report, Sheriff Robert Luna said that although deputies would be needed at a treatment campus, perhaps their role could be limited. The board was noncommittal, although some supervisors' comments could be interpreted as showing a renewed openness to a bad idea — a replacement jail.



OPINION

**Editorial: Jailed Angelenos die, deputies shrug. Will this daily routine never end?**

Oct. 26, 2023

58

We've been here before. One of those adjacent jails is Twin Towers, which sounds like it ought to be an upscale condo development but is in fact a jail that has been cited and sued almost as often as Men's Central next door. It became the county's 1990s version of a treatment-oriented facility.

As the supervisors finally recognized in 2019, an even newer jail is not the answer, because the problem is not merely a failing old building. The problem is that sheriff's deputies are trained in policing, which is the wrong skill set and wrong approach for rehabilitating people struggling with mental illness and addiction, whether or not those people have been accused of crimes. Mental health professionals have testified repeatedly that law enforcement techniques such as violent cell extractions commonly worsen the patients' condition and undermine treatment.

Recent Los Angeles County history is littered with the evidence that law enforcement is the wrong approach for psychiatric patients. For the first decade and a half of this century, jailers routinely beat and abused inmates whose conditions they could not understand. The Sheriff's Department failed so thoroughly at providing mental and medical care that it had to hand over the responsibility to county health officials — yet deputies still run the facilities and supervise the inmates, and overall care remains abysmal.



OPINION

**Editorial: Start the demolition countdown at Men's Central Jail**

April 5, 2021

Just in the last year, jailers were caught watching porn on the job instead of monitoring the people they are charged with supervising and assisting. Twenty-one people have died in L.A. County jails this year, 66 since the beginning of last year. Legal settlements that were supposed to improve conditions include one that is nearly half a century old and another that was signed this year, and many others in between.

59

To be sure, security for many mental patients is needed, particularly in the early stages of treatment. It's in no one's interest to allow the sick to wander off on their own. But locks do not by themselves turn treatment into jail as long as medical standards and practices prevail. Best practices for psychiatric treatment include "step-down beds," with higher acuity patients subject to the most security, proceeding over time to increasing levels of liberty as treatment and the patients' improvement allow.

To enable step-down care, patients should be treated close to their home communities, where most will eventually return. That means treatment should be provided at small facilities distributed around the county, not a single massive building in a jail complex.

OPINION

**Editorial: Men's Central Jail should be demolished. But what should replace it?**

June 4, 2023

These principles — a network of small locked and unlocked step-down facilities, operated by medical professionals rather than law enforcement, with contract security as needed — have been part of the county's care-first plan for years now.

That plan is stuck in limbo in part because the population of Men's Central Jail remains too high — by about 4,000 people — to close the facility. But the population reduction that supervisors said was necessary to close Men's Central was always meant to come from the entire jail system. The county has already advanced toward that milestone with the help of successful county diversion programs that direct people away from or out of all county jails.



OPINION

**Editorial: Unconscionable abuse and shameful inaction at L.A. County jails**

May 7, 2023

The Office of Diversion and Reentry, for example, provides community housing and treatment for people deemed incompetent to stand trial who might otherwise sit in Twin Towers in the near-futile hope that their conditions will improve there. That's costly and foolish.

To expand their success, programs such as ODR need more beds in more communities. That's politically challenging for the Board of Supervisors because of the typical resistance from residents to these types of facilities. But the supervisors have moved forward with housing and treatment for homeless people whose profiles are often the same as many ill people currently in jail, except that they have managed to avoid arrest.

They need to keep at it if they are to fulfill their promise to close the dungeon that is Men's Central Jail and finally break the county's cycle of jailing and failing instead of treating and healing.

## More to Read

'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan

Aug. 5, 2024



Opinion: California's budget deficit will force difficult cuts. This one should be the easiest

April 30, 2024



Editorial: Juvenile probation failures have left L.A.'s troubled kids nowhere to go

April 8, 2024



The Times Editorial Board